GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY BROWN, MELANIE LYNNE RHINE, and DENISE BOWEN, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>WEBMD LLC,<br><br>      Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

THE PARTIES....................................................................................................................2

JURISDICTION AND VENUE ...........................................................................................3

FRAUDULENT CONCEALMEANT AND TOLLING........................................................3

SUBSTANTIVE ALLEGATIONS ......................................................................................4

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ......................................................4

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies and Opt Out of the Sale of Personal Data. ...........................................11

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website...........................................................................18

        1.    The Website Causes the Interception of the Contents of Communications. ......................................................................................18

        2.    Google Cookies.....................................................................................21

        3.    Adobe Cookies......................................................................................26

        4.    Teads Cookies. .....................................................................................29

    D.    The Third Parties Intercept User Communications While in Transit .................30

    E.    The Signaling and Addressing Information Intercepted by the Third Parties. ...32

    F.    The Private Communications Collected are Valuable. ......................................34

PLAINTIFFS' EXPERIENCES ..........................................................................................35

CLASS ALLEGATIONS ....................................................................................................44

CAUSES OF ACTION ........................................................................................................46

    First Cause of Action: Invasion of Privacy.....................................................................46

    Second Cause of Action: Intrusion Upon Seclusion........................................................49

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)...........................................................................51

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ...................................................55

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation.............57

    Sixth Cause of Action: Unjust Enrichment......................................................................60

PRAYER FOR RELIEF ......................................................................................................61

CLASS ACTION COMPLAINT

Plaintiffs Mary Brown, Melanie Lynne Rhine, and Denise Bowen ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against WebMD LLC ("Defendant" or "WebMD"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

**INTRODUCTION**

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.webmd.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they do not have to accept cookies—they can instead choose to "Manage Preferences" relating to Defendant's use of cookies on the Website, as shown in the following screenshot:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to reject non-necessary cookies by turning off the "Sale of Personal Data" setting in the cookie preferences window, Defendant nonetheless caused multiple third parties—including Google LLC (DoubleClick), Adobe, Inc. (Adobe Audience Manager), and Teads SA (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

- 1 -
CLASS ACTION COMPLAINT

4.      Contrary to users' express declination or rejection of non-necessary cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they turned off the "Sale of Personal Data" setting on the Website's cookie preferences window. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.      Plaintiff Mary Brown is, and was at all relevant times, an individual and resident of Concord, California. Plaintiff intends to remain in California and makes her permanent home there.

8.      Plaintiff Melanie Lynne Rhine is, and was at all relevant times, an individual and resident of Ben Lomond, California. Plaintiff intends to remain in California and makes her permanent home there.

CLASS ACTION COMPLAINT

9.      Plaintiff Denise Bowen is, and was at all relevant times, an individual and resident of Lancaster, California. Plaintiff intends to remain in California and makes her permanent home there.

10.     Defendant WebMD LLC is a Delaware limited liability company with its principal place of business in New York City, New York.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.     Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**FRAUDULENT CONCEALMEANT AND TOLLING**

16.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting all unnecessary cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their Website visits because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experience on the Website

- 3 -

CLASS ACTION COMPLAINT

would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

17.     On or about May 8, 2023, Defendant was notified by Plaintiffs' counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of unnecessary cookies and the selling of user information. Despite this notice, Defendant did not disclose this conduct to users or modify its representations regarding users' ability to reject such data sharing.

18.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could reject unnecessary cookies while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the May 8, 2023 demand letter describing substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

19.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the

- 4 -

CLASS ACTION COMPLAINT

content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

20.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

21.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

22.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

23.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

CLASS ACTION COMPLAINT

24.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

25.     A third-party cookie is set by a third-party domain/webserver (e.g., doubleclick.net, demdex.net, teads.tv, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

26.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- 6 -

CLASS ACTION COMPLAINT

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

27.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

CLASS ACTION COMPLAINT

28.     Defendant owns and operates the Website, through which visitors can access articles, news, and informational resources concerning health and wellness, and locate healthcare providers. As they interact with the Website (e.g., by entering data into forms, searching topics of interests, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

29.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

30.     Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy[1]:

> We and our partners use cookies to collect information about your use of the Services. "Cookies" are small data files assigned to your browser when you visit a WebMD Site which enable recognition of your browser and collect and store information about your use of the Services, as described above. In addition to cookies, we and our partners use other tracking technologies that collect information about your use of the Services, including mobile identifiers and "web beacons" which are small graphic files (sometimes called "clear GIFs" or "web pixels") embedded in a web page or email typically used to monitor activity and send relevant information back to a home server (which can belong to the host site, a network advertiser or some other third party). The information collected by such tracking technologies may be combined with other information that our partners have access to, including your name, email electronically or by direct mail, that may be of interest to you.

---

[1] WebMD Privacy Policy (updated 6/1/2022) (previously available at https://www.webmd.com/about-webmd-policies/about-privacy-policy) (the "Privacy Policy"). Defendant has subsequently updated its Privacy Policy but, based on information and belief, this version was in effect at the time of Plaintiffs' rejection of all unnecessary cookies on the Website.

- 8 -

CLASS ACTION COMPLAINT

Our advertising service partners may use cookies and other tracking technologies to collect information about your use of the WebMD Sites, including content you have viewed. These third parties may use this information to help WebMD deliver advertising on the WebMD Sites and on other third party websites based on your browsing activity on the WebMD Sites. WebMD may further tailor the advertising on the WebMD Sites and these other third party websites based on additional information to the extent known by WebMD or these third parties. Two of the third parties that WebMD works with are Google and Facebook. In addition to using the information it collects performing services for WebMD, Google may also use such information as described in its privacy policy. To see how Google may use information collected through our use of the Google services on the WebMD Sites visit https://www.google.com/policies/privacy/partners.

...

To provide you with certain personalization and advertising services described herein, when you use our WebMD Sites, we may share information that we may collect from you, such as your email address (in hashed form), IP address or information about your browser or operating system, with our service provider, LiveRamp Inc. and its affiliates, which may in turn link demographic or interest based information to your browser.

...

We also work with third party ad networks to display advertising on our WebMD Sites and on third party websites. Our ad network vendors use technologies to collect information about your activities on the WebMD Sites and in our flagship WebMD App to provide you cookie-based targeted advertising on our WebMD Sites and on third party websites based upon your browsing activity and your interests.

For more information about our how cookies and other tracking technologies are used in connection with the Services, please read our Cookie Policy.

31.    Defendant further explained the third-party cookies it used on the Website as follows in its Cookie Policy[2]:

"Cookies" are small data files that are stored on the hard drive of the computer you use to view a website. Every computer that accesses a WebMD Site is assigned a different cookie by WebMD. Different Cookies serve different purposes:

…

Third party cookies are placed by someone other than WebMD, and may gather browsing activity across multiple websites and sessions. They are usually persistent cookies and are stored until you delete them or they expire based on the time period set in each third party cookie.

---

[2] WebMD Cookie Policy (Last Updated April 28, 2022) (previously available at https://www.webmd.com/about-webmd-policies/about-privacy-policy) (the "Cookie Policy"). Defendant has subsequently updated its Cookie Policy but, based on information and belief, this version was in effect at the time of Plaintiffs' rejection of all unnecessary cookies on the Website.

CLASS ACTION COMPLAINT

…

The cookies on the WebMD Sites are generally used for one of the following purposes:

**Strictly necessary**. These cookies are necessary for the WebMD Sites to function and are essential to access some areas of the WebMD Sites. For example, certain cookies enable us to identify registered members and ensure that they have access to content that is only available to registered members.

**Important functionality**. These cookies enable us to remember your preferences, such as your user name, language or the region you are in, and provide enhanced, more personalized features. They may also be used to provide services you have asked for, such as watching a video.

**Performance and Analytics**. These cookies enable us to analyze how visitors use the WebMD Sites and to monitor website performance. We use the information collected by these Cookies to improve the performance of the WebMD Sites and our Services.

**Advertising**. These cookies are used by WebMD and our advertisers to deliver advertisements on the WebMD Sites and third party sites that are more relevant to you and your interests based on your WebMD account information, content browsing activity and, in some cases, other information about you that we or our advertisers may have obtained from other sources. Cookies may be used to limit the number of times you see a particular advertisement and to enable measurement of the effectiveness of the advertising campaign. Information collected through the use of cookies may be collected directly by WebMD, our partners or third party advertisers and their ad servers.

We use cookies and other tracking technologies to recognize individual users when they access the Services, remember user preferences, keep track of users' access to and use of the Services, track whether our emails opened and whether links are clicked, ensure that the Services are functioning properly, analyze trends and to personalize the Services, including advertising on the WebMD Sites and on third party websites, so that it is relevant to individual user's interests which may be inferred based on location, prior activity on the WebMD Sites and other information that WebMD or our partners may have about our users. When you use the Services, we also automatically collect information from your browser or mobile device such as your IP address or unique device identifier, browser information (including referring URL), your preferences and settings, cookies and information about the content you have viewed and actions taken (e.g., search queries, ad engagement, clicks and the associated dates and times).

…

**<u>Third Party Cookies</u>**

Sponsors or advertisers on the WebMD Sites may use their own cookies or other tracking technologies in the banner advertisements and sponsored links and on the pages ("Brand Pages") on the WebMD Sites that consist solely of advertisements or other content from our advertisers. This advertiser content may also be served in emails, special promotions or newsletters we send you. Their advertisements may be displayed on the WebMD Sites or on other sites that you visit after you visit the WebMD Sites. Some advertisers use companies other than WebMD to serve their ads and to monitor users' responses to ads, and these ad

- 10 -

CLASS ACTION COMPLAINT

servers may also collect information through the use of cookies on the WebMD Sites.

…

We work with third party ad networks to display advertising on the WebMD Sites and on third party sites. Our ad network vendors use technologies to collect information about your activities on the WebMD Sites and our flagship WebMD App to provide you cookie-based targeted advertising based upon your browsing activity and your interests. The specific providers we use are subject to change, however below is a list of some of our current ad network partners:

Direct

| Amazon | AppNexus | Facebook | Google |
|---|---|---|---|
| Index Exchange | Live Intent | Media.Net | PubMatic |
| Rubicon | Sharethrough | Teads | Trustx |

32.     Defendant made the following additional representations about the third-party cookies it used on the Website in its "Manage Preferences" window which was accessible to Website users who clicked the "Manage Preferences" link in the popup cookie consent banner:

**Sale of Personal Data**
Under applicable state privacy laws, you have the right to opt-out of the sale of your personal information to third parties. These cookies collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out of the sale of personal information by using this toggle switch. If you opt out we will not be able to offer you personalized ads and will not hand over your personal information to any third parties. Additionally, you may contact us for further clarification about your rights under applicable state privacy laws as noted in our privacy policy. If you have enabled privacy controls on your browser (such as a plugin), we have to take that as a valid request to opt-out. Therefore we would not be able to track your activity through the web. This may affect our ability to personalize ads according to your preferences.

**B.      Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies and Opt Out of the Sale of Personal Data.**

33.     When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "By using this site, you agree with our use of cookies." The banner provided a link to the Website's Cookie Policy. Finally, the banner purported to provide users the opportunity to choose to "Accept Cookies[,]" or instead choose to "Manage Preferences[,]" as shown in the following screenshot from the Website:

- 11 -

CLASS ACTION COMPLAINT

By using this site, you agree with our use of cookies. **Cookie Policy**    **Manage Preferences**

**Accept Cookies**    ✕

34.     Plaintiffs and other Website users who elected to click or select the "Manage Preferences" link were then directed to Defendant's "Manage Preferences" window, where, in addition to further explaining the use of cookies on the Website, Defendant also represented that users could "choose not to allow certain types of cookies" by clicking "on the different category headings to find out more and change our default settings according to your preference." Defendant represented that users "cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website[,]" as shown, in relevant part, by the following screenshot (cropped to omit white space):



**WebMD**  **Manage Preferences**    ✕

**Your Privacy**

**Strictly Necessary Cookies**

**Sale of Personal Data**

**Your Privacy**

When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different category headings to find out more and change our default settings according to your preference. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.). For more information about the First and Third Party Cookies used please follow this link.

More Information

35.     Plaintiffs and other Website users could then expand two tabs or sections containing additional information. The first tab, titled "Strictly Necessary Cookies," further explained the function of these cookies but contained no user-adjustable options, as shown, in relevant part, by the following screenshot (cropped to omit white space):

CLASS ACTION COMPLAINT

36.    Defendant made further representations to Plaintiffs and other Website users in the second "Sale of Personal Data" tab that "you have the right to opt-out of the sale of your personal information to third parties. These cookies collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out of the sale of personal information by using this toggle switch. If you opt out we will not be able to offer you personalized ads and will not hand over your personal information to any third parties." The tab contained a user-adjustable toggle switch or setting, which users could adjust to the "off" position, as shown in the following screenshot:

CLASS ACTION COMPLAINT

37.     Plaintiffs and other Website users who turned off the "Sale of Personal Data" setting, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, except those "Strictly Necessary" for the Website to function, and then clicked "Confirm My Choices" could then continue to browse the Website, as the popup cookie consent banner and Manage Preferences window disappeared.

38.     Defendant's popup cookie consent banner and Manage Preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, except those "Strictly Necessary" for the Website to function, specifically including those cookies and tracking technologies used to "collect information for analytics and to personalize your experience with targeted ads." The banner and preferences window further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private

CLASS ACTION COMPLAINT

Communications with the Website, nor sell their personal data, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon turning off the "Sale of Personal Data" setting.

39.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users turned off the "Sale of Personal Data" setting or toggle, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, nor sell their personal data.

40.     Nevertheless, even after receiving that notice, Defendant caused the Third Parties' tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

41.     In particular, when users turned off the "Sale of Personal Data" setting or toggle, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on Plaintiffs' and users' devices and/or transmitted to the Third Parties along with user data, which enabled them to collect user data in real time that disclosed Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting the sale or sharing of their personal data, including the cookies and tracking technologies associated with such sharing, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

42.     Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third

Parties even after the user turned off the "Sale of Personal Data" setting on the Website's Manage Preferences window:



43.    The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at

- 16 -
CLASS ACTION COMPLAINT

https://www.webmd.com. The screenshot depicts only network traffic occurring *after* the user rejected all unnecessary cookies by turning off the "Sale of Personal Data" using the toggle on the Manage Preferences window. As shown above, despite the user's rejection of all unnecessary cookies, or at least all analytics and advertising cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like doubleclick.net, demdex.net, a.teads.tv, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. This screenshot demonstrates that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies except those "Strictly Necessary" for the operation of the Website by turning off the "Sale of Personal Data" setting or toggle. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

44.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

45.     As users interact with the Website, even after turning off the "Sale of Personal Data" setting or toggle, thereby declining or rejecting the use of unnecessary cookies and similar technologies, including for analytics and advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile

- 17 -

CLASS ACTION COMPLAINT

comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

46.    The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[3]**

**1.    The Website Causes the Interception of the Contents of Communications.**

47.    The Website includes search bars and other input fields through which users enter information. For example, below are screenshots of the search bars currently available on the Website where users can type into the search box to cause the Website to search its contents. One search bar allows users to search medical articles for symptoms or other topics of interest, while another allows users to search for healthcare providers based on conditions or procedures and location.

---

[3] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all cookies and tracking technologies in use on the Website, except those "Strictly Necessary" for the Website to function.

CLASS ACTION COMPLAINT



48.    When users input the information into these search fields, they intend to communicate the contents of their searches directly to the Website.

49.    Instead, Defendant programmed the Website such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Website.

50.    For example, the Website causes users' search queries to be transmitted to third parties, including Google, even after users have rejected all unnecessary cookies. When a user submits a search, the Website loads a results page that includes the user's query in the URL. The Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. For instance, a test search string ("Test Medical Condition") was transmitted to Google's doubleclick.net domain, along with associated identifiers and metadata:



CLASS ACTION COMPLAINT

51. As another example, below are screenshots of the WebMD Symptom Checker currently available on the Website where users can type into the text boxes to cause the Website to search its contents for conditions associated with the user's entered symptoms.

- 20 -
CLASS ACTION COMPLAINT

52. On information and belief, the Website similarly causes the information entered by users into the WebMD Symptom Checker—communications solely for transmission to the Website for purposes of obtaining information about their symptoms—to be automatically intercepted by the Third Parties while in transit in the same manner as user search queries described above.

**2.      Google Cookies.**

53. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all cookies and tracking technologies in use on the Website, except those "Strictly Necessary" for the Website to function, to and from the **doubleclick.net** domain. This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[5] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[6] In its Cookie Policy, Defendant identified Google as one of its third party "ad network partners" used "to display advertising on the WebMD Sites and on third party sites."

54. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[7] "Pages with

---

[4] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[5] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[6] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[7] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also*

CLASS ACTION COMPLAINT

Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

55.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[8] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[9]

56.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[10]

---

Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[8] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[9] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[10] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at

CLASS ACTION COMPLAINT

57.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following type of data to be sent to Google's domain, at ad.doubleclick.net:

| Parameter | Value | Description |
| --- | --- | --- |
| dc_ver | 95.280 | DoubleClick version identifier |
| sz | 300x600 | Ad size (width x height) |
| u_sd | 2 | Screen density / pixel ratio |
| dc_adk | 2584428098 | Ad key / creative identifier |
| ord | kb9mc7 | Cache buster / unique request ID |
| click | (encoded URL) | Redirect/click tracking URL |
| uach | (encoded JSON-like string) | User-Agent Client Hints |
| dc_rfl | 1,https://www.webmd.com/add-adhd/video/molly-seidel-manage-adhd$0 | Referrer info (includes page URL) |
| xdt | 0 | Experiment/debug flag |
| crlt | bvPp79Su)E | Creative token |
| stc | 1 | State/control flag |
| asnm | 1 | Ad slot / flag |
| chaa | 1 | Channel/attribute flag |
| sttr | 175 | Timing metric |
| prcl | s | Processing flag |

58.    The "dc_rfl" value above discloses to Google the specific content that the user was viewing on the WebMD website. Here, the user was viewing a webpage regarding Olympian Molly Seidel and ADHD:

https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT



59.     Along with this extensive data, the Website causes cookies to be sent to Google from the user's browser:



60.    Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[11] The documentation further confirms that the DSID is used for tracking "a signed-in user on non-Google sites."[12]

61.    In addition, the Website causes the user's user-agent information to be sent to Google:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 112.0.0.0 Safari/537.36 |

62.    The user-agent data enables Google to determine the user's device, operating system, and browser.

63.    Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

64.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

65.    Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains

[11] https://policies.google.com/technologies/cookies?hl=en-US.
[12] *Id.*

- 25 -
CLASS ACTION COMPLAINT

allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[13]

66.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[14] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3.     Adobe Cookies.**

67.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all cookies and tracking technologies in use on the Website, except those "Strictly Necessary" for the Website to function, to and from the **demdex.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform.

68.     These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[15] These cookies enable Adobe to obtain and store at least the

---

[13] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[14] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).
[15] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also*

CLASS ACTION COMPLAINT

following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[16]

69.     Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[17]

70.     For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Adobe's domain, at dpm.demdex.net:

Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).
[16] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).
[17] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

- 27 -

CLASS ACTION COMPLAINT

71.    The "d_mid" parameter is the Adobe Experience Cloud Visitor ID.[18] This is a unique id for the user, and enables Adobe to "collect and share data with other Experience Cloud solutions," and to track users across various domains.[19]

72.    In addition, the Website causes cookie data to be sent to Adobe alongside the above data:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

| | |
|---|---|
| GET    200 OK | https://dpm.demdex.net/optOu 044354661842414550905879671 5 |

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| demdex | 098744524892820307741654468643105784131 |
| dpm | 098744524892820307741654468643105784131 |
| dextp | 771-1-1682754758069\|1123-1-1682754758299\| 903-1-1682754759274\|1957-1-1682754760368\| 30432-1-1682754761319\|30646-1-1682754762497\| 81309-1-1682754763296\|796-1-1683008677982\| 269-1-1683165422870\|358-1-1683165422990\| 470-1-1683165423379\|477-1-1683165424367\| 28645-1-1683165426382\|285689-1-1683165427616\| 96678-1-1683165428361 |

73.    The "demdex" cookie contains a unique user ID, enabling Adobe to identify the user browsing the Website, and to track that user across multiple domains. Adobe's documentation depicts this as follows:[20]

---

[18] https://experienceleague.adobe.com/en/docs/id-service/using/implementation/direct-integration.
[19] https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.
[20] *See* https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request.

- 28 -



Visitor ID Request & Response

74.    Finally, the data sent to Adobe includes the user's user-agent information and IP address—which can be used to determine a user's geolocation, including whether they are located in California.

**4.    Teads Cookies.**

75.    Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all cookies and tracking technologies in use on the Website, except those "Strictly Necessary" for the Website to function, to and from the **a.teads.tv** domain.

76.    The a.teads.tv domain is associated with Teads SA, which operates a "Global Media Platform" that seeks to provide advertisers with audience information across media, including websites and television.[21] Accordingly, Teads utilizes both cookies and other tracking technologies to collect data on user interactions with websites (including browsing behavior and preferences) to perform advertising and personalization functions, i.e., to assist Teads and its customers in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to enable Teads to measure and analyze the performance of its services and to ensure that ads are effective and relevant "across the marketing funnel" across websites,[22] such as Defendant's Website. In its Cookie Policy, Defendant identified Teads as one of its third party "ad network partners" used "to display advertising on the WebMD Sites and on third party sites."

---

[21] *See* Teads: The platform that means business (available at https://www.teads.com/).
[22] *Id.*

CLASS ACTION COMPLAINT

77. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Third Parties Intercept User Communications While in Transit**

78. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

79. First, the Third Parties must read the data in real time in order to *transform* it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

80. Second, the Third Parties read the data in real time in order to *deduplicate* events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[23] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

---

[23] For example, Google's server-to-server API is the **Google Ads Conversion API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

- 30 -

CLASS ACTION COMPLAINT

81.     Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

82.     Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

83.     To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

84.     On information and belief, each of the Third Parties use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[24] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[25] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources,

[24] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[25] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

- 31 -

CLASS ACTION COMPLAINT

*transform the data*, and write the data to a destination."[26] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[27] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[28]

85.     Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendants' Website.

**E.     <u>The Signaling and Addressing Information Intercepted by the Third Parties.</u>**

86.     The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

87.     The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to

---

[26] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

[27] *Id.*

[28] *Id.*

CLASS ACTION COMPLAINT

establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

88.     Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

89.     Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

CLASS ACTION COMPLAINT

**F.      The Private Communications Collected are Valuable.**

90.      As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

91.      The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular health and wellness topics and then target those users with advertisements for related products both on the Website and across unrelated third-party websites.

92.      Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader health and wellness market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

93.      The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[29] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

94.      Numerous empirical studies quantify the appropriate value measure for personal

---

[29] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell them data or the consumer's willingness to pay to protect their information.

95.     By falsely representing consumers' ability to decline or reject cookies and opt-out of the sale of personal data, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Mary Brown**

96.     Plaintiff Brown visited the Website to seek and obtain information about personal health and well-being topics as featured on WebMD, while located in California, on multiple occasions during the last four years.

97.     Plaintiff Brown's visits to the Website were consistent with those of an ordinary user seeking information about health-related topics. Plaintiff Brown is not a consumer advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices. During her visits, Plaintiff Brown viewed articles on specific medical conditions and used the WebMD Symptom Checker to input symptoms and obtain information regarding potential conditions and treatments. In using the Symptom Checker, Plaintiff Brown entered information regarding her symptoms, which she intended to communicate to the Website to receive tailored results.

98.     When Plaintiff Brown visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Manage Preferences" link. Plaintiff Brown viewed Defendant's representation on the popup cookie consent banner that, "By using this site, you agree with our use of cookies." Plaintiff Brown also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies[,]" users could instead choose to

CLASS ACTION COMPLAINT

"Manage Preferences."

99. Plaintiff Brown selected and clicked the "Manage Preferences" link, after which the Website presented her with Defendant's "Manage Preferences" window. There, Plaintiff Brown saw that she could "choose not to allow certain types of cookies" but that she "[could not] opt-out of our First Party Strictly Necessary Cookies[.]" In selecting the "Sale of Personal Data" tab, Plaintiff Brown saw Defendant's additional representations that she "[had] the right to opt-out of the sale of your personal information to third parties…by using this toggle switch." Plaintiff Brown also saw she could opt-out of those "cookies [that] collect information for analytics and to personalize your experience with targeted ads."

100. Accordingly, Plaintiff Brown believed that turning off the "Sale of Personal Data" setting or toggle switch on the Manage Preferences window found on the Website would allow her to opt out of, decline, and/or reject all unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of personal data to third-party advertising networks and analytics services for the purposes of providing advertising and analytics), but excepting those first-party cookies "Strictly Necessary" for the Website to function.

101. Plaintiff Brown adjusted the setting or toggle to turn off the "Sale of Personal Data" and clicked the "Confirm My Choices" button. In rejecting the sale of her personal data, Plaintiff Brown gave Defendant notice that she did not consent to the use or placement of unnecessary cookies and tracking technologies that shared her information with third parties while browsing the Website. Further, Plaintiff Brown specifically rejected, based on Defendant's representations, those cookies used to "collect information for analytics and to personalize your experience with targeted ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Brown continue browsing the Website.

102. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Brown's device and/or transmitted to the Third Parties along with user data, without Plaintiff Brown's knowledge. Accordingly, the popup cookie consent

CLASS ACTION COMPLAINT

banner's representation to Plaintiff Brown that she could reject the sale of her personal data, including the use and/or placement of all unnecessary cookies and tracking technologies, or at least all analytics and advertising cookies, while she browsed the Website was false. Contrary to what Defendant made Plaintiff Brown believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

103. Then, as Plaintiff Brown continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Manage Preferences window, and despite Plaintiff Brown's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Brown's Private Communications as Plaintiff Brown browsed the Website.

104. Defendant's representations that consumers could decline or reject the sale of their personal data, including all third-party advertising and analytics cookies, except those first-party cookies "Strictly Necessary" for the Website to function, while Plaintiff Brown and users browsed the Website were untrue. Had Plaintiff Brown known this fact, she would not have used the Website. Moreover, Plaintiff Brown reviewed the popup cookie consent banner and preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Brown would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

105. Plaintiff Brown continues to desire to browse content featured on the Website. Plaintiff Brown would like to browse websites that do not misrepresent that users can decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies associated with the sale of users' personal data. If the Website were programmed to honor users' requests to decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies that cause the sale of

- 37 -

CLASS ACTION COMPLAINT

users' personal data, Plaintiff Brown would likely browse the Website again in the future, but will not do so until then. Plaintiff Brown regularly visits websites that feature content similar to that of the Website. Because Plaintiff Brown does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all unnecessary cookies and tracking technologies, Plaintiff Brown will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Brown is not a software developer and has not received training with respect to HTTP network calls.

**Melanie Lynne Rhine**

106.    Plaintiff Rhine visited the Website to seek and obtain information about personal health and well-being topics as featured on WebMD, while located in California, on one or more occasions during the last four years.

107.    Plaintiff Rhine's visits to the Website were consistent with those of an ordinary user seeking information about health-related topics. Plaintiff Rhine is not a consumer advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

108.    When Plaintiff Rhine visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Manage Preferences" link. Plaintiff Rhine viewed Defendant's representation on the popup cookie consent banner that, "By using this site, you agree with our use of cookies." Plaintiff Rhine also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies[,]" users could instead choose to "Manage Preferences."

CLASS ACTION COMPLAINT

109.    Plaintiff Rhine selected and clicked the "Manage Preferences" link, after which the Website presented her with Defendant's "Manage Preferences" window. There, Plaintiff Rhine saw that she could "choose not to allow certain types of cookies" but that she "[could not] opt-out of our First Party Strictly Necessary Cookies[.]" In selecting the "Sale of Personal Data" tab, Plaintiff Rhine saw Defendant's additional representations that she "[had] the right to opt-out of the sale of your personal information to third parties…by using this toggle switch." Plaintiff Rhine also saw she could opt-out of those "cookies [that] collect information for analytics and to personalize your experience with targeted ads."

110.    Accordingly, Plaintiff Rhine believed that turning off the "Sale of Personal Data" setting or toggle switch on the Manage Preferences window found on the Website would allow her to opt out of, decline, and/or reject all unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of personal data to third-party advertising networks and analytics services for the purposes of providing advertising and analytics), but excepting those first-party cookies "Strictly Necessary" for the Website to function.

111.    Plaintiff Rhine adjusted the setting or toggle to turn off the "Sale of Personal Data" and clicked the "Confirm My Choices" button. In rejecting the sale of her personal data, Plaintiff Rhine gave Defendant notice that she did not consent to the use or placement of unnecessary cookies and tracking technologies that shared her information with third parties while browsing the Website. Further, Plaintiff Rhine specifically rejected, based on Defendant's representations, those cookies used to "collect information for analytics and to personalize your experience with targeted ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Rhine continue browsing the Website.

112.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Rhine's device and/or transmitted to the Third Parties along with user data, without Plaintiff Rhine's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Rhine that she could reject the sale of her personal data, including the use and/or placement of all unnecessary cookies and tracking technologies, or at

- 39 -

CLASS ACTION COMPLAINT

least all analytics and advertising cookies, while she browsed the Website was false. Contrary to what Defendant made Plaintiff Rhine believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

113. Then, as Plaintiff Rhine continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Manage Preferences window, and despite Plaintiff Rhine's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Rhine's Private Communications as Plaintiff Rhine browsed the Website.

114. Defendant's representations that consumers could decline or reject the sale of their personal data, including all third-party advertising and analytics cookies, except those first-party cookies "Strictly Necessary" for the Website to function, while Plaintiff Rhine and users browsed the Website were untrue. Had Plaintiff Rhine known this fact, she would not have used the Website. Moreover, Plaintiff Rhine reviewed the popup cookie consent banner and preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Rhine would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

115. Plaintiff Rhine continues to desire to browse content featured on the Website. Plaintiff Rhine would like to browse websites that do not misrepresent that users can decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies associated with the sale of users' personal data. If the Website were programmed to honor users' requests to decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies that cause the sale of users' personal data, Plaintiff Rhine would likely browse the Website again in the future, but will not do so until then. Plaintiff Rhine regularly visits websites that feature content similar to

- 40 -

CLASS ACTION COMPLAINT

that of the Website. Because Plaintiff Rhine does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all unnecessary cookies and tracking technologies, Plaintiff Rhine will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Rhine is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Denise Bowen**

116.    Plaintiff Bowen visited the Website to seek information about personal health and well-being topics as featured on WebMD, while located in California, on one or more occasions during the last four years.

117.    Plaintiff Bowen's visits to the Website were consistent with those of an ordinary user seeking information about health-related topics. Plaintiff Bowen is not a consumer advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

118.    When Plaintiff Bowen visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Manage Preferences" link. Plaintiff Bowen viewed Defendant's representation on the popup cookie consent banner that, "By using this site, you agree with our use of cookies." Plaintiff Bowen also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies[,]" users could instead choose to "Manage Preferences."

119.    Plaintiff Bowen selected and clicked the "Manage Preferences" link, after which the Website presented her with Defendant's "Manage Preferences" window. There, Plaintiff

- 41 -

CLASS ACTION COMPLAINT

Bowen saw that she could "choose not to allow certain types of cookies" but that she "[could not] opt-out of our First Party Strictly Necessary Cookies[.]" In selecting the "Sale of Personal Data" tab, Plaintiff Bowen saw Defendant's additional representations that she "[had] the right to opt-out of the sale of your personal information to third parties…by using this toggle switch." Plaintiff Bowen also saw she could opt-out of those "cookies [that] collect information for analytics and to personalize your experience with targeted ads."

120.    Accordingly, Plaintiff Bowen believed that turning off the "Sale of Personal Data" setting or toggle switch on the Manage Preferences window found on the Website would allow her to opt out of, decline, and/or reject all unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of personal data to third-party advertising networks and analytics services for the purposes of providing advertising and analytics), but excepting those first-party cookies "Strictly Necessary" for the Website to function.

121.    Plaintiff Bowen adjusted the setting or toggle to turn off the "Sale of Personal Data" and clicked the "Confirm My Choices" button. In turning off the sale of her personal data, Plaintiff Bowen gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Bowen specifically rejected, based on Defendant's representations, those cookies used to "collect information for analytics and to personalize your experience with targeted ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Bowen continue browsing the Website.

122.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Bowen's device and/or transmitted to the Third Parties along with user data, without Plaintiff Bowen's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Bowen that she could reject the sale of her personal data, including the use and/or placement of all unnecessary cookies and tracking technologies, or at least all analytics and advertising cookies, while she browsed the Website was false. Contrary to

what Defendant made Plaintiff Bowen believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

123. Then, as Plaintiff Bowen continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Manage Preferences window, and despite Plaintiff Bowen's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Bowen's Private Communications as Plaintiff Bowen browsed the Website.

124. Defendant's representations that consumers could decline or reject the sale of their personal data, including all third-party advertising and analytics cookies, except those first-party cookies "Strictly Necessary" for the Website to function, while Plaintiff Bowen and users browsed the Website were untrue. Had Plaintiff Bowen known this fact, she would not have used the Website. Moreover, Plaintiff Bowen reviewed the popup cookie consent banner and preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Bowen would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

125. Plaintiff Bowen continues to desire to browse content featured on the Website. Plaintiff Bowen would like to browse websites that do not misrepresent that users can decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies associated with the sale of users' personal data. If the Website were programmed to honor users' requests to decline or reject all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies that cause the sale of users' personal data, Plaintiff Bowen would likely browse the Website again in the future, but will not do so until then. Plaintiff Bowen regularly visits websites that feature content similar to

- 43 -

CLASS ACTION COMPLAINT

that of the Website. Because Plaintiff Bowen does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all unnecessary cookies and tracking technologies, Plaintiff Bowen will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Bowen is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

126.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after rejecting unnecessary cookies by turning off the "Sale of Personal Data" setting or toggle in the Website's "Manage Preferences" window.

127.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

128.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

129.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful

- 44 -
CLASS ACTION COMPLAINT

conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline or reject all unnecessary cookies and tracking technologies on the Website, or at least those analytics and advertising cookies responsible for selling or sharing users' personal data, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

130. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

131. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, declined or rejected unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

132. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate their class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

CLASS ACTION COMPLAINT

133. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

134. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

135. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

136. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

137. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could opt out of, decline, or

otherwise reject the sale of their personal data, and all third party cookies involved with that sale, including at least all analytics and advertising cookies, except those first-party cookies "Strictly Necessary" for the Website to function, by adjusting or turning off the setting or toggle to do so, before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Manage Preferences window on the Website, Plaintiffs and Class members declined or rejected all unnecessary cookies and reasonably expected that she and their declination or rejection of all unnecessary cookies and tracking technologies would be honored. That is, she and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined or rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

138. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

139. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed

- 47 -

CLASS ACTION COMPLAINT

information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

140. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

141. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

142. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

143. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

144. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

145. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and

CLASS ACTION COMPLAINT

Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

146.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

147.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

148.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

149.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to decline or reject all unnecessary cookies, including analytics and advertising cookies, except those first-party cookies "Strictly Necessary" for the Website to function.

150.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding she and their Private Communications on the Website based on Defendant's promise that users could opt out of, decline, or otherwise reject the sale of their personal data, and all third party cookies involved with that sale, including at least all analytics and advertising

- 49 -

CLASS ACTION COMPLAINT

cookies, except those first-party cookies "Strictly Necessary" for the Website to function, by adjusting or turning off the setting or toggle to do so,, as well as state criminal and civil laws designed to protect individual privacy.

151. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could turn off the "Sale of Personal Data" setting or toggle, thereby opting out of, declining, or rejecting such cookies, including at least all analytics and advertising cookies, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined or rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when she and they declined or rejected all unnecessary cookies and tracking technologies, including at least those analytics and advertising cookies associated with the sale of users' personal data, Defendant would not cause such third-party cookies to be stored on she and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

152. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

153. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

154. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

155. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and

CLASS ACTION COMPLAINT

Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

156. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

157. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

158. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

159. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

160. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine,

- 51 -

CLASS ACTION COMPLAINT

instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

161.   CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

162.   Defendant is a "person" within the meaning of California Penal Code § 631.

163.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

164.   The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

165.   Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D.

- 52 -

CLASS ACTION COMPLAINT

Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

166. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

167. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

168. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

169. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information,

- 53 -

CLASS ACTION COMPLAINT

interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

170. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

171. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to decline or reject unnecessary cookies by turning off the "Sale of Personal Data" setting or toggle in the Manage Preferences window.

172. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

173. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their

- 54 -

CLASS ACTION COMPLAINT

Private Communications to the Third Parties with no consent.

174. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

175. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to personal health and wellness. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to decline or reject the sale of their personal data, including at least all third-party analytics and advertising cookies and tracking technologies, will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

176. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

177. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques

- 55 -

CLASS ACTION COMPLAINT

has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

178.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

179.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

180.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

181.    At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

182.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of

CLASS ACTION COMPLAINT

communication…") (cleaned up).

183.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting or turning off the "Sale of Personal Data" setting or toggle in the Manage Preferences window.

184.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

185.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

186.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

187.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

188.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could opt out of, decline, or otherwise reject the sale of their personal data, and all cookies involved with that sale, including at least all analytics and advertising cookies, except those first-party cookies "Strictly Necessary" for the Website to function, by adjusting or turning off the setting or toggle to do so in the Manage Preferences window.

189.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted or turned off the "Sale of Personal Data" setting or toggle in the Manage Preferences window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to opt out of, decline, or reject all such cookies.

CLASS ACTION COMPLAINT

190. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to opt out of, decline, or reject all unnecessary cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

191. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

192. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

193. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and

CLASS ACTION COMPLAINT

communications.

194.    Defendant's representation that consumers could reject all unnecessary cookies (including those cookies that "collect information for analytics and to personalize your experience with targeted ads") if they turned off the "Sale of Personal Data" setting or toggle in the Manage Preferences window was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and cookies preferences window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to advertising and analytics and/or share information with or sell user personal data to third parties, even after they choose to opt out of such sales, and all third party advertising and analytics cookies, except those first-party cookies "Strictly Necessary" for the Website's operation, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

195.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to opt out of, decline, or reject the sale of their personal data. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

196.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

197.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

198.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

- 59 -

Plaintiffs' and Class members' declination or rejection of the Website's use of unnecessary cookies, as well as the sale of their personal data. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

199.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

200.     Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

201.     Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could opt out of, decline, or reject the sale of their personal data, including all third party advertising and analytics cookies, except those first-party cookies "Strictly Necessary" for the Website to function, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined or rejected such cookies.

202.     Plaintiffs and Class members' Private Communications, including their personal data, have conferred an economic benefit on Defendant.

203.     Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant have unjustly retained the benefits of its unlawful and wrongful conduct.

204.     Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

205.     It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

CLASS ACTION COMPLAINT

206.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

207.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

208.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

### PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: April 3, 2026

- 61 -

CLASS ACTION COMPLAINT

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT